THE PLYMOUTH ROCK.

THE GEORGE H. DENTZ.

PENNSYLVANIA R. CO. *v.* THE PLYMOUTH ROCK and THE GEORGE H. DENTZ.

*(District Court, S. D. New York. November 12, 1885.)*

1. COLLISION—HELL GATE—INSPECTORS' RULES.
    The large steamer P. R., having the steam-tug G. H. D. and a tow ahead of her and on her starboard side, exchanged signals of two whistles, by which it was understood that the P. R. should pass the tug in going through Hell Gate. *Held*, that this being a violation of the inspectors' rule 9, which required the P. R. to drop astern in that situation, both vessels were culpable for the violation of the rule; and, the violation not appearing to be immaterial, both were held in fault on that ground for the collision that ensued a little above Flood rock.

2. SAME—STOPPING AND BACKING.
    *Held*, further, that the tug was also in fault for going in the middle or to the left of the middle of the stream after such signals, instead of keeping on the right-hand side, as she might have done, to give the P. R. more room;

and that the P. R. was also in further fault for not having stopped and backed in time, as she might have done upon observing the course that the tug was holding.

In Admiralty.
*Wilcox, Adams & Macklin*, for libelant.
*William Hildreth Field*, for the Plymouth Rock.
*Edwin G. Davis*, for the George H. Dentz.

BROWN, J. On the sixth of September, 1884, as the Plymouth Rock was near the upper end of Blackwell's island, in the westerly channel, bound through Hell Gate, in the flood-tide, she observed the steam-tug George H. Dentz, with three boats along-side, near the Astoria ferry, on the Long Island shore, also apparently bound through Hell Gate. She at once gave the Dentz a signal of two whistles, which were immediately answered with a similar whistle. Both pilots, as appears from the evidence, understood this signal to mean that the Plymouth Rock should pass the Dentz on the latter's port side. In attempting to do so the starboard side of the Plymouth Rock came in contact with the libelant's boat, which was on the port side of the Dentz, and did her some damage, for which this libel was filed.

The weight of evidence shows that the place of the collision was in the easterly Hell Gate passage, not far from the Gridiron, just above Flood rock, and between that and Hallett's point. On behalf of the Plymouth Rock, it is claimed that the steamer ran as near the Gridiron as safe, namely, within 20 or 25 feet of it; while the witnesses on the part of the tug testify that the tug, at the time of the collision, was in mid-channel, some 350 feet from the Gridiron.

1. Both vessels must be held in fault for this collision. No place in the harbor requires so careful navigation as the channels through Hell Gate. Rule 8 of the board of supervising inspectors, in effect, forbids steamers attempting to pass each other in going through Hell Gate, in either direction. It provides that "when they shall have arrived abreast of the north end of Blackwell's island, the steamer on the right or starboard hand of the other shall have the right of way, and the steamer on the left or port side of the other shall *check her way and drop astern.*" The tide in that vicinity runs about six miles an hour; the Plymouth Rock was, therefore, making by land about 16 miles per hour, and the Dentz about 9 miles. I find, therefore, that when the whistles were exchanged, the Dentz was not far from Astoria ferry, as located by the Plymouth Rock. She therefore had the right of way, and the Plymouth Rock, by the inspectors' rule, was bound to keep astern until the Dentz had passed through this dangerous passage. As the signal exchanged between the two was understood by both, it amounted to an assent on the part of both to depart from the inspectors' rule. As this rule had the force of a statute, (*The B. B. Saunders*, 19 Fed. Rep. 118,) it was binding upon both, and each must be held in fault for the collision which ensued through violating it; unless there were other faults of the one or the

other, so much more important and controlling as to make the latter the proper sole cause of the collision, and the violation of the rule, the remote and immaterial cause only. *The E. A. Packer,* 20 Fed. Rep. 327, 329; *The Maryland,* 19 Fed. Rep. 551, 556.

In this case there were doubtless other faults on both sides, which I shall presently notice. But the evidence does not show with such certainty the precise place of the collision in reference to the turn of the Plymouth Rock to the eastward, as warrants me in holding that the attempt to pass in the narrow and tortuous channel at Hell Gate was immaterial. The large steamer Pilgrim was following up a little astern of the Plymouth Rock. Shortly before the collision she gave the Dentz a signal of one whistle, meaning that she would pass the Dentz on the latter's starboard side, to which the Dentz also assented. This was an additional violation of the same rule of the supervising inspectors, that increased threefold the dangers of the passage. The Pilgrim had been in sight, and the Dentz may possibly have supposed she was bound to leave space for her; and if the Dentz intended to go in mid-channel, so as to leave room for one steamer on each side of her, there was great liability to error of judgment in this attempt.

The duties of these several steamers must, however, be considered in reference to the inspector's rules, as much as to the statutory rules. When the Dentz had agreed that the Plymouth Rock might pass upon her port hand, it became the duty of the Dentz to give ample space by going upon the starboard side of the channel, which was unobstructed, and by keeping on that side all the way around the bend to the right a little above Flood rock, under a port wheel, so as to give the Plymouth Rock, with her great length, room to swing without danger. Instead of doing so, the Dentz, even according to her own testimony, was no further to the right than mid-channel, and was kept heading directly towards the Hog's Back on the northern shore. As she makes the place of collision one-third of the distance towards the Hog's Back, it is not impossible that the collision arose after the Plymouth Rock commenced her swing to starboard.

Considering the testimony of the libelant, who is mainly in the situation of an impartial witness, it is probable that the collision was not as near to the Gridiron as the witnesses for the Plymouth Rock state. But in view of the narrow channel, the sharp turn of nearly a right angle just beyond Flood rock, and the great length of such boats as the Plymouth Rock, I must hold it a culpable fault in the Dentz—*First,* to have assented to any departure from the inspectors' rule; and, *second,* having done so, not to have kept upon the starboard side of the channel-way, directly around Hallett's point, so as to give undoubted room for the Plymouth Rock to make her necessary turn.

2. The Plymouth Rock is also in fault, both for deliberately violating the inspectors' rule, and also for not stopping and backing in

time to avoid the collision, when the Dentz was seen approaching to the westerly half of the channel around Hallett's point. Her pilot claims that when this was observed he could not stop, on account of the currents of that locality. I cannot accept this statement as an excuse. The Pilgrim, just astern of him, was able to stop, and did so without difficulty, and passed the Plymouth Rock some five minutes afterwards. The flood tide, since the removal of the shoals from Hallett's point, runs true between that point and Flood rock. The Dentz, according to the pilot's statement, was seen hauling to the westward after passing Astoria ferry; and the Plymouth Rock had sufficient notice of her course to have kept entire control of herself, or, if need be, to have kept astern of the Dentz, as required by the inspectors' rule, until all danger was past. Both vessels must therefore be held in fault, and a decree for the libelant be rendered against both, with costs.